## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Southern Division)

BRUCE KONYA
12 WINNING COLORS ROAD
STAFFORD, VA 22556,

SIMON SHIFF
3365 TEN BEARS CIRCLE
WICKENBURG, AZ 85390,

STEPHEN SCHWARZ
2925 HOLLY POINTE COURT
MARIETTA, GA 30062, AND

DIANA VASQUEZ
1369 MANSION COURT
SAN JOSE, CA 95120,

individually and as representatives of a class of
participants and beneficiaries on behalf of the
Lockheed Martin Corporation Salaried Employee
Retirement Program and the Lockheed Martin
Aerospace Hourly Pension Plan,

          *Plaintiffs*,

v.

LOCKHEED MARTIN CORPORATION,
6801 ROCKLEDGE DRIVE
BETHESDA, MD 20817
MONTGOMERY COUNTY,

    Serve on Resident Agent:
    CSC-Lawyers Incorporating Service
    Company
    7 St. Paul Street, Ste. 820
    Baltimore, MD 21202

          *Defendant*.

Civil Action No.

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

## COMPLAINT

1.      Plaintiffs Bruce Konya, Simon Shiff, Stephen Schwarz, and Diana Vasquez, individually and as representatives of a class of similarly situated participants and beneficiaries of the Lockheed Martin Corporation Salaried Employee Retirement Program and the Lockheed Martin Aerospace Hourly Pension Plan (the "Plans"), bring this action against Defendant Lockheed Martin Corporation ("Lockheed Martin") for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      "ERISA imposes high standards of fiduciary duty on those responsible for the administration of" pension plans—duties that are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 355–56 (4th Cir. 2014). The statute requires fiduciaries to act with both prudence and loyalty; "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). In other words, fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 419 (4th Cir. 2007) (citation omitted).

3.      Lockheed Martin egregiously violated its fiduciary responsibilities in selecting an annuity provider to pay pension benefits for 31,000 employees. Since 2021, Lockheed Martin has offloaded over $9 billion in pension obligations to Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene"), a private-equity controlled insurance company with a highly risky offshore structure. As a result of these transactions, Plaintiffs and the 31,000 similarly situated participants affected by the transactions lost their status as "participants" in the ERISA-governed Plans and consequently are no longer subject to the statute's protections for employee retirement benefits. Although ERISA does not

prohibit an employer from offloading pension obligations to an insurance company, ERISA does require that a fiduciary obtain the "safest annuity available."

4.     Instead of selecting the safest possible annuity to ensure that their employees and retirees would have continued financial security of Lockheed employees and retirees, Lockheed Martin selected Athene, which is substantially riskier than numerous traditional annuity providers. Because the market accounts for risk in pricing investments, it is likely that Lockheed Martin saved money by selecting Athene instead of the safest annuity available. Putting the company's financial interest in saving money ahead of participants' interests in retirement security by selecting a riskier annuity provider is an egregious act of disloyalty. But even if Athene's pricing was not more favorable to Lockheed Martin than traditional annuity providers, no prudent fiduciary would select a risker annuity if a safer annuity was available for the same price. By transferring Plaintiffs' pension benefits to Athene, Lockheed Martin put its employees' future retirement benefits at substantial risk of default—a risk for which they were not compensated and which devalued their pensions.

5.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plans, bring this action to obtain appropriate relief for Lockheed Martin's ERISA violations, including without limitation disgorgement of the sums involved in the improper transactions and the posting of security, to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

6.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.     **Standing.** Plaintiffs have standing to bring this action. Each of them has suffered injuries traceable to Lockheed Martin's conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan backed by one of the largest and most stable companies in the United States and placed in the hands of a private-equity controlled insurance company with a highly risky offshore structure. Plaintiffs are now subject to an increased and significant risk that they will not receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking higher risk. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk—a risk for which they have received no compensation—Plaintiffs' retirement benefits are less valuable than they were before Plaintiffs were expelled from the Plans. In addition, Plaintiffs have standing to compel Lockheed Martin to disgorge any assets derived from its illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.     **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject Plans are administered, where at least one of the alleged breaches took place, and where the Defendant resides or may be found.

## PARTIES

### The Lockheed Martin Pension Plans

9.     The Lockheed Martin Corporation Salaried Employee Retirement Program ("Salaried Plan") is a defined benefit, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering certain salaried, and certain former hourly and collectively bargained, employees of Lockheed Martin.

10.    The Lockheed Martin Aerospace Hourly Pension Plan (formerly known as the Lockheed Martin Aerospace Pension Plan for Employees in the Bargaining Unit) ("Hourly Plan") is a defined benefit, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering certain bargained and hourly employees of Lockheed Martin.

11.    The Plans were established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

12.    As of 2018, before the buy-out transactions at issue, the Salaried Plan covered 149,380 participants and held $25.2 billion in assets. By 2022, the Salaried Plan covered 91,036 participants with $17.8 billion in assets. The Hourly Plan covered 3,543 participants with $279.2 million in assets as of 2018, and 23,847 participants with $2.3 billion in assets as of 2022. The dramatic increase in assets and participants in the Hourly Plan was the result of a merger effective December 25, 2020, with the Lockheed Martin Retirement Plan for Certain Hourly Employees.

### Plaintiffs

13.    Bruce Konya resides in Stafford, Virginia, and was a participant in the Salaried Plan under 29 U.S.C. § 1002(7). Mr. Konya retired in 2016 after working for approximately 12 years as a Senior Program Manager for Lockheed Martin.

5

14.     Simon Shiff resides in Wickenburg, Arizona, and was a participant in the Salaried Plan under 29 U.S.C. § 1002(7). Mr. Shiff retired in 2020 after working for approximately 22 years as a Senior Systems Engineering Manager for Lockheed Martin.

15.     Stephen Schwarz resides in Marietta, Georgia, and was a participant in the Salaried Plan under 29 U.S.C. § 1002(7). Mr. Schwarz retired in 2020 after working for approximately 25 years as a Sustainment Manager for Lockheed Martin.

16.     Diana Vasquez resides in San Jose, California, and was a participant in both the Salaried Plan and the Hourly Plan under 29 U.S.C. § 1002(7). Ms. Vasquez retired in 2014 after approximately 40 years as an Application Analyst at Lockheed Martin.

**Defendant**

17.     Defendant Lockheed Martin (NYSE: LMT) is an American aerospace and defense corporation headquartered in Bethesda, Maryland. Lockheed Martin employs approximately 122,000 employees worldwide across more than 345 facilities. In 2023, Lockheed Martin recorded $67.6 billion in net sales and $6.9 billion in net earnings.[1]

18.     Lockheed Martin is the Plan Sponsor and Plan Administrator under 29 U.S.C. § 1002(16). Upon information and belief, Lockheed Martin is the named fiduciary with the overall responsibility for the control, management, and administration of the Plans under 29 U.S.C. § 1102(a). Lockheed Martin is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. § 1002(21)(A), 1102(a). Accordingly, as alleged herein, Lockheed Martin exercises or exercised discretionary authority or discretionary control respecting management of the Plans, exercises or exercised authority or control respecting management or disposition of

---

[1] About Us, Lockheed Martin, https://www.lockheedmartin.com/en-us/who-we-are.html.

6

Plan assets, and/or has or had discretionary authority or discretionary responsibility in the

administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

## ERISA'S FIDUCIARY STANDARDS

19.      To effectuate ERISA's primary purpose of protecting the retirement security of

plan participants, "Congress commodiously imposed fiduciary standards on persons whose

actions affect the amount of benefits retirement plan participants will receive." *John Hancock*

*Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993). ERISA imposes strict

fiduciary duties of loyalty and prudence upon the Defendant as a fiduciary of the Plans. 29

U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of
> the participants and beneficiaries and –
>
> (A) for the exclusive purpose of
>
> > (i)      providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan; [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of like character and with
> like aims.

20.      Under ERISA, fiduciaries that exercise any authority or control over plan assets

must act prudently and for the *exclusive* benefit of participants in the plan. Fiduciaries cannot act

for the benefit of third parties, including service providers to the plan.

21.      The Department of Labor has issued regulatory guidance, know as Interpretive

Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as

it relates to a fiduciary's selection of an annuity provider in connection with a pension risk

transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the

interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

22.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. §1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### Pension Risk Transfers ("PRT")

23.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's retirement system when ERISA was enacted in 1974.

24.     Pension plans provide employees and retirees with a fixed guaranteed benefit (typically a monthly payment) after retirement. Employers are generally responsible for funding the pension plan to pay their benefit obligations to employees and retirees. The amount of retirement benefits provided to employees is based on a formula including factors; such as salary and years of service.

25.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a pension plan, the

employer (or plan sponsor) bears the risk. If plan assets are inadequate to satisfy liabilities for benefit payments, it is the employer's obligation to make additional contributions to the plan to meet ERISA's funding requirements. In a defined-contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the risk of underperformance falls on the employee.

26.     Lockheed Martin experienced shortfalls in funding its pension plans. As of year-end 2018, Lockheed Martin had $43.3 billion in qualified defined benefit pension plan obligations, with plan assets totaling $32 billion, leaving the plans with an unfunded status of $11.3 billion.[2] In 2019, the net unfunded qualified defined benefit pension obligation stood at $13.23 billion.[3] In 2020, the net unfunded qualified defined benefit pension obligation stood at $12.9 billion.[4] In 2021, the net unfunded qualified defined benefit pension obligation stood at $8.3 billion.[5] In 2022, the net unfunded qualified defined benefit pension obligation stood at $5.5 billion.[6]

27.     In recent years, there has been an industry-wide uptick in employers seeking to reduce their pension funding risk through pension risk transfer ("PRT") transactions.[7] In a PRT transaction, an employer offloads all or part of its pension benefit obligations by using plan assets to purchase an annuity from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

28.     PRT transactions can take two forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through

---

[2] Lockheed Martin, *2018 Annual Report*, at 91.
[3] Lockheed Martin, *2019 Annual Report*, at 58.
[4] Lockheed Martin, *2020 Annual Report*, at 66.
[5] Lockheed Martin, *2021 Annual Report*, at 64.
[6] Lockheed Martin, *2022 Annual Report*, at 61.
[7] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 1 (July 2023).

purchase of an annuity contract;" or (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants.[8] As described in additional detail below, Lockheed Martin utilized this second form for the Plans.

29.     In the United States, the PRT market has exploded in recent years, with total PRT premiums growing to $51.8 billion in 2022, up from $27.5 billion in 2018.[9] In a PRT poll conducted by MetLife in 2023, 9 in 10 companies reported that they planned to "completely divest all of their DB pension plan liabilities in an average of 4.1 years."[10]

<b>The Risks Associated with the PRT Transactions</b>

<i><b>Lack of ERISA Protections</b></i>

30.     An employer that transfers its pension benefit obligations to an annuity provider causes participants to lose protections under ERISA. PRT transactions transfer pension obligations "from ERISA-regulated defined benefit plans to state-law governed insurance companies."[11] With few exceptions, ERISA-governed defined benefit plans are protected by the Pension Benefit Guaranty Corporation ("PBGC").[12] When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").[13]

---

[8] *Id.* at 1.
[9] Aon, *U.S. Pension Risk Transfer Market Insights*, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights#:~:text=According%20to%20Aon's%20U.S.%20Pension,has%20recorded%20in%20a%20decade.
[10] MetLife, *2023 Pension Risk Transfer Poll*, Oct. 3, 2023, https://www.metlife.com/retirement-and-income-solutions/insights/2023-pension-risk-transfer-poll/#:~:text=For%20our%202023%20Pension%20Risk,divesting%20all%20pension%20plan%20liabilities.
[11] Stein, Norman, *Statement of Norman Stein On Behalf of the Pension Rights Center Before the ERISA Advisory Council On the Subject of 29 Fed. Reg. 2509.95-1 and Risks to Participants of Pension-Risk Transfers*, Jul. 10, 2023, at 2.
[12] Pension Benefit Guaranty Corporation, *PBGC Insurance Coverage*, https://www.pbgc.gov/prac/other-guidance/insurance-coverage#:~:text=Whether%20a%20private%2Dsector%20defined,it%20is%20covered%20by%20PBGC.
[13] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, Jul. 14, 2023, at 33.

31.     ERISA-governed defined benefit plans are required to pay PBGC premiums, which fund the PBGC so that pensioners will be protected if their plan sponsor becomes insolvent. Since PRT transactions remove PBGC protections, they also remove PBGC premium obligations. Not only does this leave affected pensioners uncovered, but it poses a funding risk to the PBGC and therefore threatens the level of protection applied to plans still protected by the PBGC.

32.     SGAs are not pre-funded like the PBGC, and thus offer less protection compared to SGAs. SGAs are funded by assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC.[14] In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their insurer becomes insolvent.[15] For instance, a retiree with an annual pension benefit of $40,000, that individual would exhaust the state-governed limit in a little over six years.

***Risk of Insolvency and Executive Life***

33.     The risk of insurance company failure is not merely hypothetical. The collapse of Executive Life Insurance Company ("Executive Life") in the early 1990s demonstrates the potentially catastrophic consequences of high-risk insurance practices.[16]

34.     IB 95-1 reflects the critical importance of safety when selecting an annuity provider. NISA Investment Advisors wrote in a letter to the ERISA Advisory Council that "[c]hoosing an annuity provider when a pension plan intends to transfer liability for benefits to

---

[14] *Id.* at 33–34.
[15] National Association of Insurance Commissioners, Chapter 6—Guaranty Funds/Associations, *Receiver's Handbook for Insurance Company Insolvencies*, at 342.
[16] Eichorn, David, "Interpretive Bulletin 95-1 Statement and Request to Testify," July 6, 2023.

such annuity provider is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."[17]

35.    Executive Life held an A+ rating for financial soundness in 1982, attracting over 300,000 policyholders by 1991 who relied on it for regular payments.[18] But in 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown," and in 1991 was seized by the California insurance commissioner who proceeded to sell Executive Life's investment portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for roughly 50 cents on the dollar.[19] The losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.[20]

36.    Leon Black was the co-head of brokerage firm Drexel Burnham Lambert ("Drexel").[21]  First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was "one of Drexel's largest buyers of junk bonds."[22] In contrast to most insurance companies that invested in "stable assets like high-grade bonds, mortgage securities, and government obligations," Executive Life, led by an aggressive money manager, invested in risky junk bonds with high interest rates, which allowed them to make higher payouts to policyholders.[23] Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse.[24]

---

[17] Eichorn, David, "Interpretive Bulletin 95-1 Statement and Request to Testify," July 6, 2023.
[18] Gretchen Morgenson & Joshua Rosner. *These Are the Plunderers: How Private Equity Runs—and Wrecks—America,* at 32–33, Simon & Schuster (2023).
[19] *Id.* at 33–34.
[20] *Id.* at 107.
[21] *Id.* at 47.
[22] *Id.* at 66.
[23] *Id.* at 66–67.
[24] *Id.* at 67.

37.     By 1990, many of the Executive Life assets "held to meet policyholder claims" "were in distress and trading for far less" than their purchase price.[25] However, on December 27, 1990, the NAIC published its findings that Executive Life's California and New York insurers were not in "imminent financial danger" and thus takeovers by state insurance regulators were unnecessary.[26] Executive Life held "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's, which it often mentioned in response to questions from critics regarding the makeup of the Executive Life bond portfolio.[27]

38.     On April 1, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California "because its precarious financial position made it a threat to its policyholders."[28] Up until a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best, meaning it was still considered to be "'very good'" despite a decline in position pending review. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, the New York insurance regulator seized Executive Life of New York on April 17, 1991, and just weeks later parent company First Executive filed for bankruptcy.[29]

***Response to Executive Life and Interpretative Bulletin 95-1***

39.     In response to the financial collapse of Executive Life, Congress passed the Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1993). Through the amendment, Congress created a right of action to obtain appropriate relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," such as "the

---

[25] *Id.* at 68.
[26] *Id.* at 71–72.
[27] Demick, Barbara, *A.M. Best finds credibility under fire*, Baltimore Sun, July 28, 1991, updated October 25, 2018, https://www.baltimoresun.com/1991/07/28/a-m-best-finds-credibility-under-fire/.
[28] Gretchen Morgenson & Joshua Rosner. *These Are The Plunderers: How Private Equity Runs—and Wrecks—America*, at 75, Simon & Schuster (2023).
[29] *Id.*

posting of security," to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. §1132(a)(9).

40.     As noted, the Department of Labor's Interpretive Bulletin 95-1 ("IB 95-1") establishes a framework for ERISA compliance when choosing an annuity provider in a pension risk transfer transaction.[30] The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise."[31]

41.     In order to determine the safest available annuity, IB 95-1 requires plan fiduciaries "to evaluate the insurer's claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "the size of the insurer relative to the proposed contract;" (3) "the level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting them; and (6) the availability of additional protection through state guaranty associations. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to properly evaluate these factors.[32]

***Private Equity Firms***

42.     Traditional players in the PRT market include established life and annuity providers, such as Prudential, New York Life Insurance Company, and MetLife. However, private equity firms have an increasing role in the PRT landscape.  In fact, "private equity firms have significantly heightened their exposure to and influence over the life and annuity insurance industry" overall through both the purchasing of life insurers and their serving as third-party

---

[30] 29 CFR §2509.95-1.
[31] 29 CFR §2509.95-1.
[32] ERISA Advisory Council, *Statement of the 2023 Advisory Council on Employee Welfare and Pension Benefit Plans to the U.S. Department of Labor Regarding Interpretive Bulletin 95-1*, August 29, 2023.

asset managers for insurers.[33] Not only do private equity firms receive cash from premiums that can be invested into their other affiliated businesses, but they can also generate "enormous fees for themselves" for investment management services.[34]

43.     Private equity firms primarily began purchasing insurance companies "to finance their expanding operations."[35] Today, they have moved beyond this business into the lines of private credit and insurance.[36] As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.[37]

44.     Such a trend has been concerning to lawmakers and industry experts. On March 16, 2022, Senator Sherrod Brown of Ohio sent a letter to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing his concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."[38]

45.     In the wake of the surge in recent years in life insurer liabilities and annuity sales, such as through PRT transactions, many life insurers "report razor-thin surpluses relative to the size and risk profile of their balance sheets."[39] This "increased use of complex investment

---

[33] Sherrod Brown - U.S. Senator for Ohio, *Brown Continues Push on Private Equity Firms' Involvement in the Insurance Industry*, August 5, 2022, https://www.brown.senate.gov/newsroom/press/release/sherrod-brown-continues-push-private-equity-firms-involvement-insurance-industry.
[34] Gretchen Morgenson & Joshua Rosner. *These Are The Plunderers: How Private Equity Runs—and Wrecks—America*, at 34. Simon & Schuster (2023).
[35] Ballou, Brendan, *Plunder: Private Equity's Plan to Pillage America*, at 125. Hatchette Affairs Public Affairs Group (2023).
[36] *Id.* at 119.
[37] *Id.* at 126.
[38] Brown, Sherrod, *Letter to the Federal Insurance Office and National Association of Insurance Commissioners re: private equity's involvement in life insurance*, March 16, 2022.
[39] *Id.* at 6.

strategies has led to the greater prominence of illiquid and volatile assets on insurers' books," a stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies.[40] These high-risk, "high-yield" investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem competitively attractive. In reality, "private-equity returns are no better than those for index funds after fees."[41]

### Athene and its Financial Risks

46.     Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd., which was founded in 2009 by Apollo executives as an insurance affiliate. As previously indicated, Apollo executives contributed to the collapse of Executive Life.

47.     Athene is one of the leading players in the PRT market, having completed 45 transactions totaling $50.5 billion and covering over 550,000 plan participants.[42] In terms of pension liabilities, the Plans represent approximately 20% of Athene's business. On March 8, 2021, Apollo announced its merger with Athene, which closed in 2022. At the time, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue.[43]

48.     Athene established subsidiary Athene Life Re ("ALR"), an offshore captive reinsurer headquartered in Hamilton, Bermuda.[44] In Bermuda, "capital requirements are lower than insurers, investment limitations virtually non-existent and transparency is minimal to

[40] Sherrod Brown - U.S. Senator for Ohio, *Brown Continues Push on Private Equity Firms' Involvement in the Insurance Industry*, August 5, 2022, https://www.brown.senate.gov/newsroom/press/release/sherrod-brown-continues-push-private-equity-firms-involvement-insurance-industry.
[41] Hough, Jack, "How Private Equity Stacks Up Against The Stock Market," p. 9, Barron's, September 18, 2023.
[42] "Pension Group Annuities," Athene, https://www.athene.com/pension-group-annuities.
[43] Farman, Madeleine, *Apollo's merger with Athene highlights PE's rush for permanent capital*, S&P Global Market Intelligence, March 25, 2021, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/apollo-s-merger-with-athene-highlights-pe-s-rush-for-permanent-capital-63263065.
[44] Home Page, Athene Life Re, https://www.athenelifere.bm/.

zero."[45] In part, this is because regulation requirements differ between the U.S. and these offshore jurisdictions. In Bermuda, "'[t]he Bermuda Solvency Capital Requirement (BSCR) requires insurers to hold similar levels of capital against both corporate bonds and CLOs, even though some CLO tranches have a larger downside risk than bonds with the same credit rating.'"[46] In the United States, the NAIC's Securities Valuation Office ("SVO") "announced changes in how it would calculate capital charges for collateralized loan obligations" in June 2022.[47]

49.    Athene saw this move by the SVO as an attack on their business models, arguing that "hiking capital charges for CLOs could weaken the wider market for the products." However, such a change would just "bring capital charges in line with equivalently rated corporate bonds."[48]

50.    Tom Gober is a forensic accountant, Certified Fraud Examiner, and 13-year Insurance Examiner who has spent 37 years working both for and with government entities including Mississippi state regulators, the Department of Justice, the U.S. Attorney's Office, and the Federal Bureau of Investigation. Gober studies PRT transactions by reading life insurers' regulatory filings and looking for evidence of high-quality assets backing liabilities. According to Gober, "'the substance of all troubles I've investigated spin out of unregulated affiliates.'"

---

[45] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 2, July 10, 2023.
[46] Hatfield, William, qtd. in Micah Hauptman, *Testimony to the Advisory Council on Employee Welfare and Pension Benefit Plans (ERISA Advisory Council)*, July 18, 2023.
[47] Tipping, Nathan, *How US insurers went to war over CLOs*, Risk.net, November 15, 2023, https://www.risk.net/investing/7958234/how-us-insurers-went-to-war-over-clos#:~:text=These%20insurers%20and%20some%20industry,reputational%20risk%E2%80%9D%20to%20the%20industry.
[48] *Id.*

Gober believes that affiliated transactions, such as those between Athene and ALR, are some of the biggest issues facing the PRT space.[49]

51.     In an analysis of Athene's transfer activity between its affiliates, Gober found that "Athene Annuity Re Ltd of Bermuda ended up with $87 billion on its books in 2020," and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. Apollo's practice of reinsuring liabilities with its captive reinsurers opens up excess capital but does not decrease risk. If "only a fraction" of that reinsurance transferred in 2021 was backed by LOCs which were evaluated with SAP and consequently disallowed, "Athene would face a funding shortfall." According to Gober, a funding shortfall for Athene would spell trouble for Apollo as well: at the time of Gober's calculations, Athene Holding's insurance companies represented 40% of Apollo's value.[50]

52.     Annuity and life companies maintain surpluses to ensure long-term solvency, but those with captive reinsurers use them "to back their liabilities with assets that would not be admitted by examiners in their own domiciles."[51] Such a practice enables the insurer to appear to have more free capital than they do, and the lack of oversight in offshore jurisdictions leave the reinsurer's management "free to do virtually anything with the extra funds," despite their purpose being to ensure solvency and protect the best interests of policyholders.[52] Captive reinsurance allows life insurers to "move capital-intensive liabilities offshore, release hundreds of millions of dollars in surplus capital that they can use to buy back their own stock, raise

[49] Pechter, Kerry. *NAIC Eyes Bermuda Triangle Strategy*, Retirement Income Journal, November 4, 2021, https://retirementincomejournal.com/article/naic-eyes-bermuda-triangle-strategy/.
[50] Komisar, Lucy. *Captives of Industry: How Wall Street is Cashing in on Your Insurance*, 100 Reporters, https://100r.org/2022/09/insurance-company-captives/.
[51] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 4, July 10, 2023.
[52] *Id.* at 4.

executive compensation, price their annuities more competitively, and evolve into the kind of fee-generating businesses that Wall Street analysts and investors prefer."[53]

53.    The United States Private Equity Council named Apollo one of the top ten private equity firms in 2022.[54] Like with other private equity-owned insurers, Athene's rapidly increasing role in the PRT market has been cause for concern for many industry experts. The mission of private equity does not align with the best interests of policyholders. "Private equity firms' focus is on maximizing their immediate financial returns, rather than ensuring that promised retirement benefits are there at the end of the day for policyholders. This type of business model is not necessarily a natural fit for the insurance business, where a failure can put policyholders at very significant risk."[55]

54.    The United States Department of the Treasury has expressed similar concerns, writing that it merits further consideration "whether a potential misalignment may exist between the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests."[56] Apollo specifically "was, in many ways, culturally ill suited" to create and run Athene. Its reputation as "cutthroat" and "bare-knuckled" does not align with the historically conservative nature of life insurance, which should be primarily concerned with fulfilling policyholder obligations.[57]

---

[53] Pechter, Kerry. *NAIC Eyes Bermuda Triangle Strategy,* Retirement Income Journal, November 4, 2021, https://retirementincomejournal.com/article/naic-eyes-bermuda-triangle-strategy/.
[54] United States Private Equity Council, *Apollo Global Management*, https://www.uspec.org/private-equity-firms/apollo-global-management, (2024).
[55] Ballou, Brendan, *Plunder: Private Equity's Plan to Pillage America,* Hatchette Affairs Public Affairs Group, at 127 (2023).
[56] Department of the Treasury, *Letter from Jonathan C. Davidson, U.S. Department of the Treasury, to Senator Sherrod Brown,* June 29, 2022, https://www.banking.senate.gov/imo/media/doc/fio_85.pdf.
[57] Ballou, Brendan. *Plunder: Private Equity's Plan to Pillage America,* p. 127. Hatchette Affairs Public Affairs Group, 2023.

55.     On October 13, 2022, NISA Investment Advisors reported the results of a study to evaluate the creditworthiness of nine PRT insurance providers, including Athene.[58] To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%."[59] As shown below, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene at bottom of "Questionable Candidates: Demands Extenuating Circumstances."

FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

56.     Section 321 of the SECURE 2.0 Act of 2022 directed the Department of Labor to review IB 95-1 and then consult with the Advisory Council on Employee Welfare and Pension Benefit Plans ("ERISA Advisory Council" or "Council") to determine whether further updates to IB 95-1 were necessary.[60] On July 18, 2023, the Council held a meeting at which they consulted

---

[58] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.
[59] *Id.*
[60] U.S. Department of Labor Employee Benefits Security Administration, *ERISA Advisory Council*, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council.

20

with the Employee Benefits Security Administration ("EBSA") and heard public comments. At the hearing, stakeholders raised several concerns surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.[61] Bill Wheeler and Sean Brennan of Athene testified that Athene is "'the most transparent'" life insurer, which forensic accountant and Certified Fraud Examiner Tom Gober described as "'the opposite of the truth.'"[62]

**Lockheed Martin's PRT Transactions with Athene**

57. Through two separation transactions with Athene, Lockheed Martin transferred pension liabilities to Athene Annuity and Life Company or Athene Annuity & Life Assurance Company of New York (collectively "Athene").[63] Lockheed Martin therefore no longer guarantees pension benefits and is not subject to ERISA's funding requirement. As a result, the Defendant caused Plan participants to lose the stringent protections under ERISA and placed their retirement assets at risk of Athene's insolvency. PBGC's guarantee of Plan participants' benefits simply ended.

58. On August 3, 2021, Lockheed Martin announced the additional transfer of approximately $4.9 billion of its gross pension obligations and related plan assets for approximately 18,000 U.S. retirees and beneficiaries to Athene.[64] Lockheed Martin's purchase of the group annuity contracts was effective on that date. According to Forms 5500 filed with the Department of Labor, $3.8 billion of these obligations were transferred to Athene for 11,000

---

[61] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 14 (July 2023).
[62] Pechter, Kerry, *Of Athene, Pension Risk Transfers, and Fiduciaries*, Retirement Income Journal, July 28, 2023, https://retirementincomejournal.com/article/of-private-equity-and-pension-risk-transfers/.
[63] Athene Annuity and Life Assurance Company of New York is a subsidiary of Athene Annuity and Life Company, which provides annuity benefits to Plan participants who reside in New York.
[64] *Athene Announces $4.9 Billion Pension Risk Transfer Transaction with Lockheed Martin*, PR Newswire, August 3, 2021, https://www.prnewswire.com/news-releases/athene-announces-4-9-billion-pension-risk-transfer-transaction-with-lockheed-martin-301347561.html.

retirees and beneficiaries in the Salaried Plan, and $1.1 billion of these obligations were transferred to Athene for 9,500 retirees and beneficiaries in the Hourly Plan.

59.     Subsequently, on June 27, 2022, Lockheed Martin announced the transfer of approximately $4.3 billion of its gross pension obligations and related plan assets in the Plans for approximately 13,600 U.S. retirees and beneficiaries to Athene.[65] Lockheed Martin purchased the group annuity contracts from Athene on June 23, 2022. The Salaried Plan represented approximately $3.5 billion of these obligations for 8,900 retirees and beneficiaries, while the Hourly Plan represented approximately $800 million of these obligations for 4,700 retirees and beneficiaries. On June 1, 2023, Athene began paying pension benefits to affected retirees and beneficiaries.

**Lockheed Martin Acted in its Own Self-Interest in Transferring its Pension Obligations**

60.     Lockheed Martin failed to lawfully discharge its duties in selecting Athene as the Plans' annuity provider and transferring billions of dollars of Plan participants' retirement assets. Lockheed Martin failed to select the safest annuity available to provide retirees and beneficiaries pension benefits. Relative to traditional annuity providers, Athene invests in far riskier assets to support participants' benefit payments. This risk is compounded by numerous factors, including Athene's reinsurance of annuities with offshore affiliates. In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary would have offloaded billions of participants' retirement savings to Athene under the circumstances then prevailing. As discussed in further detail below, Lockheed Martin sacrificed the retirement security of retirees and beneficiaries for corporate profits.

---

[65] *Lockheed Martin Reduces Gross Pension Obligation By $4.3 Billion With Purchase Of Group Annuity Contracts*, Lockheed Martin, June 27, 2022, https://news.lockheedmartin.com/2022-06-27-Lockheed-Martin-Reduces-Gross-Pension-Obligation-by-4-3-Billion-with-Purchase-of-Group-Annuity-Contracts.

61.    IB 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." Despite this guidance, plan sponsors may still be drawn to private equity-backed insurers who charge a lower price than more traditional insurers to take on the same liabilities. Allison Wielobob, General Counsel for the American Retirement Association and former staff member in the Office of Regulations and Interpretations of the Employee Benefits Security Administration, cautions that "'the plan sponsor may be focused on getting a good price in a transfer transaction. But a plan sponsor engaging in a pension risk transfer, it is still an ERISA fiduciary, and is required to act prudently and in the best interests of the plan's participants and beneficiaries."[66]

62.    On information and belief, Lockheed Martin received an economic benefit from the selection of Athene in the form of reduced premium payments relative to what it would have paid to an established and reputable insurance provider, such as Prudential and New York Life. Even if Athene's pricing was not more favorable to Lockheed Martin than traditional annuity providers, no prudent fiduciary would select a riskier annuity if a safer annuity was available for the same price.

63.    With the dramatic increase in PRT transactions during 2022 as more firms entered the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the importance of fiduciaries ensuring that low bidders are not taking undue risks.[67] This wider range in premiums is shown in Figure 1.

---

[66] Iekel, John, *Fiduciary Duty a Factor in Pension Risk Transfers*, American Society of Pension Professionals & Actuaries, August 30, 2023, https://www.asppa.org/news/fiduciary-duty-factor-pension-risk-transfers.
[67] Fiona Ng & Tanner McKerlie et. al., *Pension Risk Transfer: Staying Current in a Rapidly Evolving Market*, Milliman, June 23, 2023, https://www.milliman.com/en/insight/pension-risk-transfer-staying-current-evolving-market.



64.     Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. In 2022, for partial buyouts, such as in the case for Lockheed Martin, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions.[68]

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs seek class action certification on behalf of all participants in the Lockheed Martin Corporation Salaried Employee Retirement Program and the Lockheed Martin Aerospace Hourly Pension Plan and their beneficiaries since March 13, 2018 for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

66.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

    a.      The proposed class includes over 31,000 members and is so large that joinder of all its members is impracticable.

---

[68] Aon, *U.S. Pension Risk Transfer: Market Insights*, at 12, Mar. 2023, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights.

b.      There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Lockheed Martin violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

c.      Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plans and were subjected to Lockheed Martin's conduct in transferring their benefit payments to the Athene entities.

d.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Lockheed Martin with respect to their obligations to the Plans and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Lockheed Martin acted or refused to act in the same manner generally to the class, so that

final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

        g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Lockheed Martin's common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

        67.      Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[69] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[70] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

---

[69] *Available at* http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.
[70] *Available at* http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

2015);[71] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[72] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[73] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [74] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[75] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[76] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[77]

## COUNT I

### Breach of Fiduciary Duties—29 U.S.C. § 1104(a)(1)(A)–(B)

68.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

69.     Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plans and transactions at issue.

70.     As such, Defendant was required to discharge its duties with respect to the Plans "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plans' participants and beneficiaries and defraying reasonable expenses of administering the Plans, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

---

[71] *Available at* http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.
[72] *Available at* http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.
[73] *Available at* http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.
[74] *Available at* http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.
[75] *Available at* http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.
[76] *Available at* http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.
[77] *Available at* http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

71.     Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

72.     Defendant breached its fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity available. On information and belief, Defendant selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to save the company money and enhance corporate profits. In so doing, Defendant breached their duty of loyalty by favoring its own corporate interests over the participants' interests in a secure retirement. Because Defendant's goal and motivation was to save the company money, Defendant's search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

73.     The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

74.     Defendant is subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by Defendant by virtue of purchasing Athene annuities instead of the safest possible annuity, and the

posting of security to assure receipt by Plaintiffs and class members of their full retirement

benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## COUNT II

### Prohibited Transactions—29 U.S.C. § 1106

75.     Plaintiffs restate and incorporate the allegations contained in the preceding

paragraphs.

76.     ERISA supplements the general fiduciary duties by categorically prohibiting

certain transactions. 29 U.S.C. §1106(a)(1), (b).

77.     Section 1106(a) prohibits various transactions between a plan and a "party in

interest," which Congress defined to encompass "those entities that a fiduciary might be inclined

to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith

Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service

providers. 29 U.S.C. §1002(14)(A)–(C).

78.     Section 1106(b) categorically prohibits a fiduciary from engaging in certain

transactions with a plan, which often involve self-dealing.

79.     Athene was a party in interest because it provided services to the Plans. 29 U.S.C.

§ 1002(14)(B). Defendant knowingly caused the Plans to engage in transactions resulting in a

direct or indirect sale or exchange of property between the Plans and Athene; furnishing of

services between the Plans and Athene; or transfers of Plan assets to or for the use by or benefit

of Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

80.     The transactions at issue do not qualify for any exemption from the prohibitions

of § 1106(a). Given the substantial risk that Athene's retention posed to participants' retirement

benefits, Athene received more than reasonable compensation for its services to the Plans.

81.     By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase Defendant's corporate profits, Defendant dealt with the assets of the Plans in their own interest or for their own account; and acted on behalf of a party (Lockheed Martin) whose interest in using a riskier, lower-cost annuity provider were adverse to the interests of the Plans' participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

82.     The harm suffered by Plaintiffs and class members from these prohibited transactions includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

83.     Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by Defendant by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## COUNT III

### Failure to Monitor Fiduciaries

84.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

85.     Defendant's fiduciary responsibility for overseeing the Plans included monitoring any other fiduciaries appointed or hired to manage the Plans on a day-to-day basis, including the day-to-day responsibility of selecting service providers such as an annuity provider.

86.     A monitoring fiduciary must ensure that those to whom it fiduciary duties are delegated performing their delegated duties in compliance with ERISA's fiduciary standards.

87.     Defendant breached its fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B), and Interpretive Bulletin 95-1.

88.     Had Defendant fulfilled its fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or Defendant would have decided not to proceed with the transactions. As a result of these monitoring failures, Plaintiffs and class members suffered harm including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

89.     Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendant has breached its fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendant to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

31

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

March 13, 2024                    Respectfully submitted,

                                 /s/ P. Matthew Darby
                                 P. Matthew Darby
                                 Darby Law Group LLC
                                 201 International Circle, Suite 200
                                 Hunt Valley, MD 21030
                                 Phone: (833) 601-7245
                                 matt@darby-lawgroup.com


                                 /s/  Jerome J. Schlichter
                                 SCHLICHTER BOGARD LLP
                                 Jerome J. Schlichter*
                                 Sean E. Soyars*
                                 Kurt C. Struckhoff*
                                 100 South Fourth Street, Suite 1200
                                 St. Louis, Missouri 63102
                                 Phone: (314) 621-6115, Fax: (314) 621-5934
                                 jschlichter@uselaws.com
                                 ssoyars@uselaws.com
                                 kstruckhoff@uselaws.com

                                 *Pro Hac Vice application forthcoming

                                 Attorneys for Plaintiffs