## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BRUCE KONYA, SIMON SHIFF, STEPHEN SCHWARZ, DIANA VASQUEZ, individually and as representatives of a class of participants and beneficiaries on behalf of the Lockheed Martin Corporation Salaried Employee Retirement Program and the Lockheed Martin Aerospace Hourly Pension Plan, | Civ. No. 24-750-BAH |

Plaintiffs,

v.

LOCKHEED MARTIN CORPORATION,

Defendant.

### MEMORANDUM OPINION

In this putative class action, Plaintiffs are four retirees who allege that Defendant Lockheed

Martin ("Lockheed" or "Defendant") violated the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in the transfer of their pension plans to a private annuity

through a process known as a "pension risk transfer," or "PRT." *See* ECF 1 (complaint). Lockheed

has filed a motion to dismiss (hereinafter the "motion"), *see* ECF 26 (motion) and ECF 26-1

(memorandum in support), which is now fully briefed, *see* ECF 35 (Plaintiffs' opposition), ECF

1

48 (Defendant's reply).[1]  Having reviewed the parties' papers[2] and having held oral argument on

October 10, 2024,[3] for the reasons that follow, the motion is **DENIED**.

## I.    **BACKGROUND**[4]

Lockheed is an American aerospace and defense corporation headquartered in Bethesda,

Maryland.  ECF 1, at 6 ¶ 17.  Lockheed was "the Plan Sponsor and Plan Administrator under 29

U.S.C. § 1002(16)," *id.* ¶ 18, of two pension plans: (1) the Lockheed Martin Salaried Employee

Retirement Program ("Salaried Plan") and (2) the Lockheed Martin Aerospace Hourly Pension

Plan ("Hourly Plan") (collectively, the "Plans"), *id.* at 5 ¶¶ 9–10.  Plaintiffs—Bruce Konya, Simon

Shiff, Stephen Schwarz, and Diana Vasquez—are Lockheed retirees, each of whom were vested

participants in either of the two Plans before the Plans were terminated and transferred to an

annuity provider.  *See id.* at 5–6 ¶¶ 13–16.[5]  As of 2019, before the PRT transactions at the heart

---

[1] The Court also reviewed an amicus brief filed by the Pension Rights Center.  *See* ECF 47-1.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[3] This case was transferred to the undersigned on January 22, 2025.  The hearing was conducted by the Honorable Peter J. Messitte prior to his passing on January 11, 2025.  Judge Messitte was a legal titan who ably presided over thousands of cases as a state and federal trial court judge.  He was also a beloved colleague who was known for his tireless efforts to strengthen the independence of courts throughout the world, especially in Latin America.  The Court mourns his passing.

Pursuant to Rule 63 of the Federal Rules of Civil Procedure, the Court certifies familiarity with the record of this case, including transcripts of the hearing held on October 10, 2024, and determines that the case can be completed by the undersigned without prejudice to the parties.

[4] As will be explained below, for the purposes of resolving a motion to dismiss, the Court must accept all well-pled facts in a complaint as true.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  Accordingly, this Background section recounts the facts as they appear in the complaint.  At this stage, the Court does not express any finding as to whether the facts alleged therein are true.

[5] Plaintiffs sue on behalf of themselves and a proposed class of 31,000 Lockheed retirees.  ECF 1, at 24 ¶ 65.

of this case, Plaintiffs allege that "the Salaried Plan covered 149,380 participants and held \$25.2 billion in assets." *Id.* ¶ 12. "By 2022," Plaintiffs further allege, "the Salaried Plan covered 91,036 participants with \$17.8 billion in assets." *Id.* In 2018, "[t]he Hourly Plan covered 3,543 participants with \$279.2 million in assets." *Id.* Due to a 2020 merger with another retirement plan, the Hourly Plan assets had grown to \$2.3 billion in assets" and "23,847 participants" by 2022. *Id.*

Before delving into Plaintiffs' claims, the Court finds it helpful to begin with the legal context in which this case arises.

### A. ERISA and PRTs

This case concerns ERISA, the federal statute governing employee benefit plans. *See* 29 U.S.C. § 1001 et seq. Congress enacted ERISA to protect "the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *Id.* § 1001(b).

ERISA covers various retirement programs, including both defined-contribution and defined-benefit (i.e., pension) plans. *Id.* § 1002. A defined-contribution plan is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account," *see* 29 U.S.C. § 1002(34), where benefits are tied to the value of their accounts and benefits can turn on investment decisions. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). By contrast, a defined-benefit plan is fixed: "retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id.* Employers, not plan

3

participants, are "on the hook for plan shortfalls." *Id.* at 543. Lockheed's Plans were defined-benefit plans. ECF 1, at 5 ¶¶ 9–10.

Defined-benefit plans impose high funding risks to employers, not only because employers are on the hook for any funding shortfalls, but also because ERISA imposes on plan fiduciaries the duties of prudence and loyalty. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 355–56 (4th Cir. 2014); 29 U.S.C. § 1104(a) (setting forth the duties of ERISA fiduciaries). A well-known principle of ERISA is that "[t]he fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are . . . the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Lockheed, according to Plaintiffs, carried this legal and financial burden, as it exercised discretionary authority and control over the management of the Plans and thus, Plaintiffs allege, Lockheed is a fiduciary within the meaning of ERISA. ECF 1, at 6–7 ¶ 18; *see* 29 U.S.C. §§ 1002(21)(A), 1102(a). In addition, under ERISA, the general fiduciary duties are supplemented by a detailed list of transactions that are "categorically barr[ed]" under ERISA because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000) (citing 29 U.S.C. § 1106(a)–(b) and 29 U.S.C §1002(14)).

ERISA does, however, allow employers to end such fiduciary obligations by terminating their pension plans altogether. *See, e.g.*, 29 U.S.C. § 1341; *Beck v. PACE Int'l Union*, 551 U.S. 96, 101–02 (2007); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999). The relevant termination technique here is through a "buyout" PRT. ECF 1, at 9 ¶ 27. In a PRT transaction, an employer transfers pension plan assets and liabilities to an annuity provider, who then assumes

4

responsibility for issuing future benefit payments to covered beneficiaries. *Id.* at 9–10 ¶¶ 27–28.

PRTs can transfer some or all of the benefits owed to plan participants and, once completed, a PRT

extinguishes an employer's pension plan's obligation to a beneficiary and re-establishes it under

the annuity provider. *See, e.g., Lee v. Verizon Commc'ns, Inc., et al.*, 837 F.3d 523, 538 (5th Cir.

2016). This is what Lockheed opted to do with the Plans in 2021 and 2022. ECF 1, at 21–22 ¶¶

57–59.

According to Plaintiffs, PRT transactions are attractive to businesses because they remove

such plans from the scope of ERISA and put them into state-law governed insurance companies,

*id.* at 10–11 ¶¶ 30–32, making them no longer subject to ERISA's funding requirement and other

statutory protections, *id.* at 21–22 ¶¶ 57–58. An important difference between annuities and

ERISA plans is the entity that serves as a final "backstop" protecting each retirement benefit;

annuities are protected by state guaranty associations ("SGAs"), usually up to $250,000 per

beneficiary, *id.* at 11 ¶ 32, while the backstop for ERISA plans is the federally chartered Pension

Benefit Guaranty Corporation ("PBGC"), *id.* at 10 ¶ 30. Plaintiffs allege that SGAs offer less

protection than the PBGC and do not guarantee their full benefits, increasing the risk that Plaintiffs

will not ultimately receive their full benefits. *Id.* at 11 ¶ 32.

Another concern of Plaintiffs is that while PRT transactions have grown substantially in

recent years, *id.* at 10 ¶ 29, these transactions have not all gone smoothly, *id.* at 11–13 ¶¶ 33–38.

Plaintiffs point to the notorious collapse of the Executive Life Insurance Company in the early

1990s, which cost the full retirement benefits of over 300,000 policyholders, including tens of

thousands of pensioners. *Id.*; *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 293 (5th Cir.

2000). In response to the Executive Life collapse, Plaintiffs allege that "Congress passed the

Pension Annuitants Protection Act of 1994." ECF 1, at 13 ¶ 39 (citing Pub. L. No. 103-401 (Oct.

22, 1993)).  This created "a right of action to obtain appropriate relief for ERISA violations involving the 'purchase of an insurance contract or insurance annuity,' such as 'the posting of security,' to ensure that participants receive their full benefits, plus prejudgment interest." *Id.* at 13–14 (citing 29 U.S.C. § 1132(a)(9)).  Subsequently, the Department of Labor ("DOL") issued Interpretive Bulletin 95-1 ("IB 95-1") regarding PRTs. *Id.* at 14 ¶ 40 (citing 29 C.F.R. § 2509.95-1).  The guidance in IB 95-1 sets forth six factors for fiduciaries to consider in selecting an annuity provider in a PRT transaction:

1. The quality and diversification of the annuity provider's investment portfolio.
2. The size of the insurer relative to the proposed contract.
3. The level of the insurer's capital and surplus.
4. The lines of business of the annuity provider and other indications of an insurer's exposure to liability.
5. The structure of the annuity contract and guarantees supporting the annuities, such as the use of separate accounts.
6. The availability of additional protection through state guaranty associations and the extent of their guarantee
7. s.

29 C.F.R. §§ 2509.95-1(c)(1)–(6).

### B. Factual Allegations

As noted, this case involves two PRTs where Lockheed transferred its pension liabilities to annuity provider Athene Annuity & Life Assurance Company of New York ("Athene"), which Plaintiffs allege is "a private equity controlled insurance company with a highly risky offshore structure." ECF 1, at 2 ¶ 3.  It is that termination and transfer of the Plans to Athene that generated

this lawsuit.[6] *Id.* at 21–22 ¶¶ 57–59. Specifically, Plaintiffs allege that Lockheed "egregiously violated its fiduciary responsibilities in" making the selection of Athene. *Id.* at 2 ¶ 3. "By transferring Plaintiffs' pension benefits to Athene," Plaintiffs allege that Lockheed "put its employees' future retirement benefits at substantial risk of default—a risk for which they were not compensated and which devalued their pensions." *Id.* "To remedy these fiduciary breaches," Plaintiffs generally seek "disgorgement of the sums involved in the improper transactions and the posting of security, to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest." *Id.* ¶ 5.

Plaintiffs allege that Lockheed violated its statutory and fiduciary duties when it "offloaded over $9 billion in pension obligations" due under the Plans causing "Plaintiffs and the 31,000 similarly situated participants affected by the transactions [to lose] their status as 'participants' in the ERISA-governed Plans." *Id.* at 2 ¶ 3. Plaintiffs allege that a fiduciary undertaking a PRT transaction must obtain the "safest annuity available" under the dictates of IB 95-1, but claims that Athene was far from it and was, for various alleged reasons, "substantially riskier than numerous traditional annuity providers." *Id.* at 2–3 ¶¶ 3–4. Plaintiffs say Lockheed chose this riskier alternative to traditional annuity providers to save money at the expense of Plaintiffs' retirement safety. *Id.* at 3 ¶ 4, at 28 ¶ 72 (alleging that Defendant "selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but

---

[6] At issue are "two separate transactions" between Athene and Lockheed. ECF 1, at 21 ¶ 57. The first occurred on August 3, 2021, when Lockheed transferred "approximately $4.9 billion of its gross pension obligations and related plan assets for approximately 18,000 U.S. retirees and beneficiaries to Athene." *Id.* ¶ 58. "Subsequently, on June 27, 2022," Plaintiffs allege that Lockheed "announced the transfer of approximately $4.3 billion of its gross pension obligations and related plan assets in the Plans for approximately 13,600 U.S. retirees and beneficiaries to Athene." *Id.* at 22 ¶ 59. Plaintiffs allege that "[o]n June 1, 2023, Athene began paying pension benefits to affected retirees and beneficiaries." *Id.*

7

to save the company money and enhance corporate profits"). Plaintiffs further claim that Athene is especially risky because it is "a private-equity controlled insurer with a highly risky offshore structure." ECF 1, at 2 ¶ 3. Plaintiffs allege that Lockheed breached its fiduciary duties by foregoing more appropriate, less risky annuities that were available. *Id.* at 2–3 ¶¶ 3–4. Ultimately, Plaintiffs' complaint is best summarized as alleging that "Lockheed Martin sacrificed the retirement security of retirees and beneficiaries for corporate profits." *Id.* at 22 ¶ 60.

Plaintiffs acknowledge, as they must, that Athene began paying annuity benefits to affected Lockheed beneficiaries on June 1, 2023. *Id.* at 22 ¶ 59. Thus, Plaintiffs do not claim that Athene has failed to pay any benefits. Instead, Plaintiffs generally allege that their harm is two-fold: "an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to the uncompensated risk." *Id.* at 28 ¶ 73.

Plaintiffs raise three causes of action related to the PRTs. First, they allege a breach of fiduciary duty under 29 U.S.C. § 1104(a)(l)(A)–(B) (count I). *Id.* at 27–29 ¶¶ 67–74. Deeming Lockheed a "'fiduciary' as defined by ERISA with respect to the Plans and transactions at issue," Plaintiffs claim that Lockheed breached this duty by selecting "Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to save [Lockheed] money and enhance corporate profits." *Id.* at 28 ¶ 72. "In so doing," Plaintiffs allege, "Defendant breached their duty of loyalty by favoring its own corporate interests over the [Plaintiffs'] interests in a secure retirement." *Id.* Plaintiffs allege that:

> Defendant is subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by Defendant by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest.

*Id.* at 28–29 ¶ 74 (citing 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9)).

Plaintiffs' second cause of action alleges that the PRTs represented prohibited transactions in violation of 29 U.S.C. § 1106(a) and (b) (count II). *Id.* at 29–30 ¶¶ 75–83. Plaintiffs note that § 1106(b) "categorically prohibits a fiduciary from engaging in certain transactions" with a covered ERISA plan, *id.* ¶ 78, and further claim that "Athene was a party in interest because it provided services to the Plans," *id.* ¶ 79.

Lastly, Plaintiffs allege that Lockheed failed to monitor fiduciaries by "by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(I)(A) and (B), and [IB] 95-1" (count III). *Id.* at 30–31 ¶¶ 84–88. "Had [Lockheed] fulfilled its fiduciary monitoring duties," Plaintiffs allege, "Athene would have been rejected in favor of the safest possible annuity or [Lockheed] would have decided not to proceed with the [PRTs]." *Id.* at 31 ¶ 88.

Plaintiffs seek equitable relief, including disgorgement of the cost savings derived from the alleged improper transactions and the posting of security to assure that Plaintiffs receive their full retirement benefits. *Id.* at 3 ¶ 5, at 28–29 ¶ 74, at 30 ¶ 83.

## II.   <u>LEGAL STANDARDS</u>

Defendant asks this Court to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a complaint for a lack of subject matter jurisdiction. "Rule 12(b)(1) governs motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction." *Stone v. Trump*, 400 F. Supp. 3d 317, 333 (D. Md. 2019); *see also Pruitt v. Resurgent Cap. Servs., LP*, 610 F. Supp. 3d 775, 779 (D. Md. 2022) (explaining that motions to dismiss for lack of standing are considered under Rule 12(b)(1)). "The party invoking federal jurisdiction bears the burden"

9

of establishing the "three elements" of standing: injury-in-fact, traceability, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing, a plaintiff must show "(1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan*, 504 U.S. 555, 560–61). The "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

"Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, "[a] challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed in two ways: either by a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 455 (D. Md. 2020) (citing *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).

In a *facial* challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see also Lujan*, 504 U.S. at 561 ("At the pleadings stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the

claim." (cleaned up)). However, in a *factual* challenge "the district court is entitled to decide

disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. The

court "may regard the pleadings as mere evidence on the issue and may consider evidence outside

the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't

of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004) (citations omitted). For example, "a trial court

may consider evidence by affidavit, depositions or live testimony" and "weigh[] the evidence to

determine its jurisdiction." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). But "'where the

jurisdictional facts are intertwined with the facts central to the merits of the dispute,' a presumption

of truthfulness should attach to the plaintiff's allegation." *Kerns*, 585 F.3d at 193 (quoting *Adams*,

697 F.2d at 1219).

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim

upon which relief can be granted." *See also* Fed. R. Civ. P. 8(a) ("A pleading that states a claim

for relief must contain . . . a short and plain statement of the claim showing that the pleader is

entitled to relief . . . ."). In considering a motion under this rule, courts discount legal conclusions

stated in the complaint and "accept as true all of the factual allegations contained in the complaint."

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court then draws all reasonable inferences in favor of the plaintiff and considers whether the

complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v.

Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court must

examine the complaint as a whole, accept all well-pled facts as true, and construe the factual

allegations in the light most favorable to the plaintiff. *See Lambeth v. Bd. of Comm'rs of Davidson*

11

*Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III.    ANALYSIS

### A. Rule 12(b)(1): Subject Matter Jurisdiction

Lockheed raises three contentions with respect to its challenge of this Court's subject matter jurisdiction: *first*, Lockheed raises a threshold facial standing challenge by arguing that Plaintiffs cannot show a constitutionally cognizable injury-in-fact; *second*, it argues Plaintiffs' claims are unripe, and *third*, Lockheed says Plaintiffs' claimed statutory jurisdictional basis under ERISA is lacking. ECF 26-1, at 9–10. The Court addresses each contention in turn.

#### 1. *Article III Standing*

"Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). "Article III gives federal courts jurisdiction only over 'cases and controversies,' U.S. Const. art. III, § 2, cl. 1, and the doctrine of standing identifies disputes appropriate for judicial resolution." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–76 (1982)). There is no case or controversy unless the plaintiff has standing to assert their claim. *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A party properly moves for dismissal pursuant to Rule 12(b)(1) where the court lacks subject matter jurisdiction over the claims alleged in the complaint.

To establish "the irreducible constitutional minimum of standing" at the pleading stage, a plaintiff must "'clearly . . . allege facts demonstrating'" that it "'(1) [has] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

redressed by a favorable judicial decision.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560). An "injury-in-fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339. The injury must be "legally and judicially cognizable," and the dispute must be one that "is 'traditionally thought to be capable of resolution through the judicial process.'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)).

Relevant to the instant dispute, while hypothetical or conjectural injuries will not suffice, an allegation of *future* injury may be sufficient if "the risk of harm is sufficiently imminent and substantial." *TransUnion LLC*, 594 U.S. at 415, 435 (2021) (citing *Spokeo*, 578 U.S. at 341–42; *Clapper*, 568 U.S. at 141 n.5). Plaintiffs need only support their standing "in the same way as any other matter on which [they] bear[] the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Therefore, to survive a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice, [since] on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (quotation omitted). At the pleading stage especially, it has been said that "[i]njury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.).

Lockheed's fundamental standing argument is that Plaintiffs "cannot point to any concrete, imminent injury that they have suffered as a result of the PRTs." ECF 26-1, at 10. Lockheed says "PRTs do not result in loss of retirement benefits," they only "change[]" "the benefit provider." *Id.* at 13. Since Plaintiffs acknowledge that they have received their full benefits from Athene and likewise fail to allege that any future loss of benefits is imminent, Lockheed insists that Plaintiffs cannot show they have standing. *Id.* at 17.

13

Plaintiffs counter with two ways in which they claim to have suffered a cognizable injury. Primarily, they point to "an increased and significant risk that they will not receive the benefit payments to which they are entitled." ECF 1, at 4 ¶ 7. Separately, they point to the devaluing of their pension benefits, by claiming that their "retirement benefits are less valuable than they were before Plaintiffs were expelled from the Plans." *Id.* In support of both claims the complaint includes, for example, a discussion of Athene's relationship with the entity responsible for the collapse of Executive Life, the potential significance of the offshore location of its subsidiary reinsurer, reference to the research of a forensic accountant and certified fraud examiner Tom Gober,[7] who notes, among other assertions, the risks associated with private equity ownership of entities that provide retirement benefits, as is the case with Athene. *Id.* at 16–19 ¶¶ 46–54. Plaintiffs also cite to an October 13, 2022 evaluation "of the creditworthiness of nine PRT insurance providers, including Athene." *Id.* at 20 ¶ 55. That study ranked Athene nine out of nine, referring to it as a "questionable candidate" with a "14.0% ELB," or "economic loss to beneficiaries due to credit risk." *Id.* Plaintiffs also point to alleged false statements regarding Athene's "transparency" made by Athene executives at a July 18, 2023 hearing addressing

---

[7] Gober also provided a declaration in support of Plaintiffs' response to the motion to dismiss. *See* ECF 35-3. At the motions hearing, Judge Messitte accurately noted that portions of the Gober declaration were referenced in the complaint and also indicated that he would consider the affidavit as effectively "being part of the complaint." *See* Tr. of. Mot. Hearing, ECF 67, at 96 ("I will consider [the declaration] insofar as it's relevant. And I'll consider it sort of retroactively, if you will, as being considered part of the complaint."). The Court has reviewed the declaration and similarly notes that aspects of its contents are found on the face of the complaint. However, as the Court notes later, many of the issues raised in the declaration (and refuted by Defendant), though bearing on "jurisdictional facts," are also "inextricably intertwined" with facts central to Plaintiffs' claims. *Kerns*, 585 F.3d at 193. To the extent the declaration is referenced in the Court's factual recitation and analysis, it is because the Court wishes to remain faithful to Judge Messitte's promise to consider the declaration.

14

concerns related to private equity involvement in the insurance and annuity business. *Id.* at 20–21 ¶ 56.

Both parties cite to *Thole v. U.S. Bank*, 590 U.S. 538 (2020), which, as the most recent U.S. Supreme Court case involving both ERISA and Article III standing, is an apt starting-point. In *Thole*, two retirees in U.S. Bank's retirement plan alleged that U.S. Bank "violated ERISA's duties of loyalty and prudence by poorly investing the assets of the plan," and sought damages and injunctive relief. *Id.* at 540–41. In support of their claim, the plaintiffs pointed to "mismanagement [of the U.S Bank retirement plan that] occurred more than a decade ago, from 2007 to 2010," which resulted in "approximately $750 million in losses." *Id.* at 541. In addressing standing, the Supreme Court explained that it was "[o]f decisive importance" that "the [*Thole*] plaintiffs' retirement plan is a defined-benefit plan, not a defined-contribution plan" and that the plaintiffs therefore "receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id.* at 540. The majority noted that "[i]f [the plaintiffs] were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less." *Id.* at 541 (emphasis in original). "If [the plaintiffs] were to *win* [the] lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more." *Id.* (emphasis in original). As such, the *Thole* majority concluded, the plaintiffs had no standing to bring suit because they had "no concrete stake in [the] lawsuit." *Id.*[8]

---

[8] The *Thole* Court also rejected the argument that the plaintiffs had an "equitable or property interest in the plan" such that "injuries to the *plan* are . . . injuries to the plan *participants*." 590 U.S. at 542 (emphasis added). The Court explained that "[t]he plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed" because "[t]he benefits paid to the participants in a defined-benefit plan are not tied to the value of the plan." *Id.* at 543. It appears from the complaint that Plaintiffs' pensions work the same way. *See* ECF 1, at 8 ¶ 24 ("Pension plans provide employees and retirees with a fixed guaranteed benefit (typically a

15

Given the apparent recognition that a plaintiff lacks constitutional standing if they allege past mismanagement of their retirement plan but suffer no actual reduction in payments, it is understandable that Lockheed hangs it hat on *Thole*. ECF 26-1, at 12. Given that Plaintiffs fail to allege any disruption in their annuity payments, it could be argued that, as Defendant does, "*Thole* effectively decides this case." *Id.* Critically, however, *Thole* left undecided the question of whether a plaintiff who continues to receive a pension without interruption may nonetheless have standing so long as they raise an allegation of retirement plan mismanagement egregious enough to generate a "substantial risk of default." 590 U.S. at 546. As the *Thole* Court noted:

> According to the plaintiffs' amici, plan participants in a defined-benefit plan have standing to sue if the mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits. But the plaintiffs do not assert that theory of standing in this Court. In any event, the plaintiffs' complaint did not plausibly and clearly claim that the alleged mismanagement of the plan substantially increased the risk that the plan and the employer would fail and be unable to pay the plaintiffs' future pension benefits. It is true that the plaintiffs' complaint alleged that the plan was underfunded for a period of time. But a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk that the plan and the employer would both fail.

---

monthly payment) after retirement."). Thus, to the extent Plaintiffs allege that they establish standing *solely* based on the mere "decrease in value of their pension benefits due to uncompensated risk," ECF 1, at 28 ¶ 73, *Thole* seems to have closed that road to potential standing. But that is not this case, and analogies to trust law here permit Plaintiffs' standing to bring this suit. The Supreme Court noted that "trust law informs but does not control interpretation of ERISA." *Thole*, 590 U.S. at 542 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)). The difference between typical trust beneficiaries and defined-benefit beneficiaries is that "[i]n the private trust context, the value of the trust property and the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so every penny of gain or loss is at the beneficiaries' risk." *Id.* Contrast that with the fixed amount defined-benefit pensioners will receive. *Id.* But even with this important difference, the *Thole* Court plainly left open the door for pensioners' standing to challenge "mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits." *Id.* at 546. Thus, even after *Thole*, trust law still informs an ERISA challenge brought on this (admittedly narrow) theory, as Plaintiffs do here.

16

*Id.* at 546 (citations omitted). In noting that the Court need not confront the issue, the Court further observed that "[a]ny increased-risk-of-harm theory of standing . . . might not be available for plan participants whose benefits are guaranteed in full *by the PBGC*." *Id.* at n.2 (emphasis added).

*Thole* undoubtedly establishes that the mere allegation of plan mismanagement, standing alone, is not enough to confer standing on a defined-benefit retirement plan participant whose payments have not been reduced or suspended as "[t]here is no ERISA exception to Article III." 590 U.S. at 547. However, Plaintiffs raise a different type of claim here, namely that Lockheed breached a fiduciary duty by offloading their pensions to Athene, which has resulted in an "increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk." ECF 1, at 28 ¶ 73. In other words, Plaintiffs generally raise a type of allegation that the *Thole* plaintiffs did not: whether "mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits." *Thole*, 590 U.S. at 546. Plus, the complaint here moves further away from *Thole* as Plaintiffs allege that the transfer to Athene removed PBGC protection in favor of SGAs, which Plaintiffs allege "offer less protection" than the PBGC. ECF 1, at 11 ¶ 32.[9]

Lockheed characterizes Plaintiffs' harm as an "inchoate fear" unsupported by adequate facts. ECF 26-1, at 19. But, as noted, the complaint alleges much more than a bare allegation that Athene might hypothetically fail. For example, Plaintiffs point to the collapse of Executive Life Insurance Company in the early 1990s to buttress their allegations of the very real possibility that

---

[9] Plaintiffs note that SGAs "only provide coverage up to state law limits rather than one standard limit as defined by the PBGC." ECF 1, at 11 ¶ 32. In most states, Plaintiffs allege, this limit is set to a level so low that it "could exhaust in mere years if their insurer becomes insolvent." *Id.* "For instance, a retiree with an annual pension benefit of $40,000 . . . would exhaust the state-governed limit in a little over six years." *Id.*

Athene's allegedly high-risk insurance practices pose an imminent harm to Plaintiffs' retirement annuities. ECF 1, at 11–22 ¶ 33–59. The Executive Life incident, Plaintiffs allege, highlights the importance of choosing a safe annuity provider, a fact recognized by Congress when it passed the Pension Annuitants Protection Act of 1994 which created a right of action to obtain relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," such as "the posting of security" to ensure that participants receive their full benefits. *See id.* at 13–14 ¶ 39 (citing 29 U.S.C. § 1132(a)(9)).

Another aspect of concern related to the transfer is Athene's private equity composition. *Id.* at 14–20 ¶¶ 42–56. Plaintiffs allege that Athene is an especially risky annuity because "[t]he mission of private equity does not align with the best interests of policyholders" and presents an unsustainable business model in the annuity space. *Id.* at 19 ¶¶ 53–54. They claim that private equity firms benefit from premium cash flows and generate significant fees through investment management, with their investments primarily aimed at financing their own businesses. *See id.* at 14–15 ¶¶ 42–43. Plaintiffs further allege that Athene in particular has created complicated schemes to avoid restrictions on capital requirement reserves, including the creation of the subsidiary Athene Life Re ("ALR"), a captive reinsurer operating offshore in Bermuda where oversight is less stringent. *Id.* at 16–17 ¶ 48.

By 2023, Plaintiffs further allege, private equity firms had spent nearly $40 billion acquiring insurance companies and controlled over 7% of the industry's assets, a sharp rise from 2015. *Id.* at 15 ¶ 43. Plaintiffs say this trend has raised concerns among lawmakers and industry experts, particularly due to the shift in insurance companies' strategies towards high-risk, illiquid assets, a departure from the traditionally safe investments like corporate bonds. *Id.* ¶ 44. While these strategies can yield higher returns, they also pose risks, as private equity-owned insurers

18

offer more competitive PRT bids despite their returns often "being no better than those for index funds after fees." *Id.* at 15–16 ¶ 45 (citing Jack Hough, *How Private Equity Stacks Up Against the Stock Market*, Barron's, Sept. 18, 2023, at 9).

Plaintiffs also explain why Athene's involvement in the PRT market is cause for significant concern. *See id.* at 16 ¶¶ 46–47. Plaintiffs allege that Athene's use of ALR in Bermuda, where regulatory oversight is minimal, makes Athene appear financially stronger while using surplus capital for stock buybacks and other investments. *Id.* at 16 ¶ 48, at 18 ¶ 52. The U.S. Department of the Treasury has raised similar concerns about the misalignment between private equity's "cutthroat" short-term profit focus and the long-term stability required in the insurance industry. *Id.* at 19 ¶ 54. Forensic accountant Gober believes that these transactions create hidden risks, as offshore reinsurers are not subject to the same regulatory scrutiny, jeopardizing policyholders' interests. *Id.* Gober also explained that Athene's surplus declined from 1.7% of liabilities to 1.2%, an "exceedingly small" surplus, meaning that only a small percentage of Athene's investments need sour before the state is legally empowered to take step in, hearkening back to the Executive Life disaster. *See* ECF 35-3.

Faithfully applying *Thole*, the relevant question is not one centering on whether Plaintiffs are currently receiving their expected benefits (they unquestionably are), but rather one that asks whether they have adequately alleged that Lockheed's transfer of the Plans to Athene represents "mismanagement . . . so egregious that it substantially increased the risk that [Plaintiffs' retirement plan] would fail and be unable to pay the participants' future pension benefits." *Thole*, 590 U.S. at 546. The Court believes that at this early stage, Plaintiffs have adequately alleged facts, if only barely so, sufficient to conclude there is "a substantially increased risk" that Athene will fail and Plaintiffs' will suffer harm because of it. *Id.* Moreover, it appears undisputed that their pensions

19

are no longer guaranteed in full by the PBGC. *Id.* at n.2. Also, Plaintiffs' requested remedy—the posting of security and disgorgement—would serve to protect their ability to receive their vested retirement benefits. As such, the Court finds they have eked out sufficient injury-in-fact to establish standing.

*David v. Alphin*, 704 F.3d 327 (4th Cir. 2013), does not compel a different result. There, a putative class of participants in two retirement plans sponsored by the Bank of America Corporation ("BOA") alleged mismanagement by BOA in "selecting and maintaining [BOA]-affiliated mutual funds in the investment menu for [its] 401(k) Plan and the [BOA's] separate but related Pension Plan." *Id.* at 329. In analyzing whether the defined-benefit plan recipients had adequately alleged a harm, the Fourth Circuit held that "the risk that [the plaintiffs'] pension benefits will at some point in the future be adversely affected as a result of the present alleged ERISA violations is too speculative to give rise to Article III standing." *Id.* at 338. Moreover, the *David* Court noted that even if the pension was at risk, "the participants' vested benefits are guaranteed by the PBGC up to a statutory minimum." *Id.* What the Fourth Circuit explicitly decided *not* to consider was the question of "[w]hether an Article III injury-in-fact results from the possibility that (1) a pension plan will terminate in an underfunded state, and (2) PBGC will not pay full benefits[.]" *Id.* Given that Plaintiffs have provided plausible allegations that the transfer to Athene put their pensions at serious risk and further allege that the PBGC will not provide a requisite backstop to protect their retirement, the Court finds that they have effectively threaded the needle for standing and the case can proceed to discovery.[10]

---

[10] How Plaintiffs fare at later stages of litigation is an entirely different question, and Defendant has provided significant support for its claim that Plaintiffs' accusations, though perhaps plausible, are nonetheless incorrect. *See* ECF 26-1, at 14–16. But the sole question before the Court is whether Plaintiffs have alleged a plausible claim for relief on the face of the complaint. *See Iqbal*, 556 U.S. at 678. Having concluded that they have, the analysis, at least at this stage, ceases.

*Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021), a post-*Thole* case, also counsels in favor of finding that Plaintiffs have standing. *Peters* involved a self-funded healthcare plan that hired Aetna, a health insurer, as a claims administrator. *Id.* at 210. The Aetna plan was not authorized to charge itself (or its participants) administrative fees for the use of a chiropractic and physical therapy subcontractor. *Id.* However, the plaintiff alleged Aetna did so nonetheless by creatively hiding the fees through a "bundled rate." *Id.* The plaintiff, a participant in the Aetna plan, brought suit under ERISA alleging that Aetna breached its fiduciary duties based on this bundled fee arrangement that assessed costs beyond what the plan allowed. *Id.* The plaintiff sought equitable relief (including restitution, surcharge, disgorgement, and declaratory and injunctive relief) on. behalf of herself, her healthcare plan, and similarly situated class members. *Id.* at 213.

One issue with the plaintiff's claim in *Peters*, however, was that the plaintiff may have "actually saved money, or broke even, despite use of the bundled rate." *Id.* at 218. As such, the district court concluded, the plaintiff failed to "demonstrate[] how she could have possibly suffered any injury from . . . health care transactions that, on balance, saved her money." *Id.* (citation omitted). The Fourth Circuit disagreed and held that the fact that the plaintiff "may have benefitted from the determination of certain claims d[id] not offset the fact that she was harmed by others," and that she had adequately demonstrated that she and her healthcare plan had "suffered a financial injury" and "satisfied the injury-in-fact requirement for Article III standing." *Id.* at 218–19.

The Fourth Circuit did not, however, end its analysis there. Instead, it continued by noting that "[e]ven if [the plaintiff] failed to demonstrate a financial injury for standing purposes as to the restitution claim, her allegations revolving around breach of fiduciary duty would separately provide her standing to pursue claims for surcharge, disgorgement, and declaratory and injunctive relief." *Id.* at 219. Citing to *Pender v. Bank of America Corp.*, the *Peters* Court reiterated "that 'a

financial loss [was] not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA.'" *Id.* (quoting *Pender*, 788 F.3d 354, 365–66 (4th Cir. 2015)). "This precept," the *Peters* Court noted, "was fundamental in the disgorgement context because '[r]equiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss.'" *Id.* (quoting *Pender*, 788 F.3d at 265– 66). Thus, "Plaintiffs need not demonstrate individualized injury to proceed with their claims for injunctive relief under § [1132](a)(3); they may allege only violation of the fiduciary duty owed to them as a participant in and beneficiary of their respective ERISA plans." *Id.* (quoting *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 610 (6th Cir. 2007)). With this understanding, the Court agreed that in addition to pleading actual financial harm from the allegedly prohibited transactions, the *Peters* plaintiff properly alleged standing "by enumerating the fiduciary duties she contends were owed to her and the . . . subsequent violation of those duties." *Id.* "Accordingly, even without a personal financial injury," the Fourth Circuit held that the plaintiff established "standing to maintain her claims for surcharge, disgorgement, and declaratory and injunctive relief based on her allegations of breach of fiduciary duty." *Id.*

Lockheed rejects this entire section of *Peters* as "dicta," ECF 26-1, at 12 n.18, and further argues that *Peters* (and *Pender*, on which it relies) "concern fundamentally different ERISA rights with fundamentally different effects on individual participants," ECF 48, at 11. The Court agrees that the plan at issue in *Peters*, a healthcare plan, is obviously different than the defined-benefit plan at the heart of this case. However, this does not change the more basic finding in *Peters* that "even *without a personal financial injury*," a plaintiff raising an ERISA claim "has standing to maintain . . . claims for surcharge, disgorgement, and declaratory and injunctive relief based on . . . allegations of breach of fiduciary duty." 2 F.4th at 221 (emphasis added). And though

22

Lockheed would have the Court reject six paragraphs of well-reasoned analysis as dicta, the Court is not as sure that the *Peters* Court's analysis as it relates to standing in the absence of financial injury is merely non-binding commentary. Indeed, the analysis at issue built on past precedent and unequivocally noted that the fiduciary duty claims "separately provide[d] standing." *Id.*

Defendant is correct that some portions of *Peters* have subsequently been called into question by, among other cases, *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 503 (4th Cir. 2023). However, a review of the majority's holding in *Rose*—including a brave (and successful) attempt by Judge Richardson to simplify the distinction between "legal" and "equitable" remedies—yields the conclusion that to the extent that *Peters* has been overruled, it is only as to the point that *Peters* endorsed the argument that a viable claim in equity could be maintained when a plaintiff seeks "merely personal liability upon the defendants to pay a sum of money[.]" *Id.* at 504 (citations omitted). *Rose* explicitly noted that "plaintiffs that seek to strip away [a] defendant's unjust gains might have better luck" since that "relief qualifies as 'equitable,' so long as the plaintiff can trace those unjust gains to 'specifically identified funds that remain in the defendant's possession or against traceable items that the defendant purchased with the funds.'" *Id.* (citing *Montanile v. Bd. of Trs.*, 577 U.S. 136, 144–45 (2016)). This is precisely the remedy Plaintiffs seek here. *See* ECF 1, at 3 ¶ 5 ("To remedy these fiduciary breaches, Plaintiffs[] . . . bring this action to obtain appropriate relief for Lockheed['s] ERISA violations, including without limitation disgorgement of the sums involved in the improper transactions and the posting of security . . . .").

To the extent that Lockheed claims *Peters* is inapposite because the participants in the Aetna healthcare plan "paid for their own medical benefits, and thus had a personal legal right to those benefits—i.e. a 'personal stake' and 'direct personal loss,'" ECF 48, at 4 (citing *Peters*, 2 F.4th 221–22), this fact was relevant to the *Peters* plaintiff's "claim for restitution," not to the

23

"claims based on surcharge, disgorgement, and declaratory and injunctive relief that," the *Peters* Court reiterated, "do not require a showing of personal financial harm." 2 F.4th at 221.

The Court is thus constrained to find that *Peters* remains "good law" and provides an alternative basis for standing in trust law,[11] the "underlying substantive law" which serves "to define the relevant injuries for standing purposes." Curtis A. Bradley and Ernest A. Young, *Standing and Probabilistic Injury*, 122 Mich. L. Rev. 1557, 1561 (2024); *TransUnion*, 594 U.S. at 417. Applying Fourth Circuit precedent, the Court finds that Plaintiffs have adequately alleged an independent Article III injury because the claim that *the selection of Athene* was a breach of fiduciary duty, which alone gives rise to standing when coupled with the allegations related to Athene's alleged instability and potential risk of failure.

The Supreme Court's standing analysis in *TransUnion LLC v. Ramirez*, notably decided after *Thole*, also supports standing in cases of intangible injuries if such injuries have, like those resulting from a breach of fiduciary duty, been recognized as traditionally recognizing a "basis for a lawsuit in American courts." 594 U.S. at 417. As the *TransUnion* Court noted:

> To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing. *Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts*—such as physical harm, monetary harm, or various intangible harms including (as relevant here) reputational harm.

*Id.* (emphasis added). The Court's analysis in *TransUnion*, one that looks to the underlying "traditionally recognized" harm, provides a strong endorsement to apply caselaw that holds that breach of fiduciary duty confers standing for disgorgement and other forward-looking equitable

---

[11] While *Thole* recognized that trust-law analogy does not support standing for plaintiffs "who allege mismanagement of a defined-benefit plan," 490 U.S. at 543, the Court, as discussed above, finds Plaintiffs' allegations sufficiently distinguishable.

relief (despite the fact that those cases involved different types of benefit plans). *Pender*, 788 F.3d at 354; *Peters*, 2 F.4th at 199.

The Court fully acknowledges that the question on injury-in-fact presents a close call. In many ways, the dispute over subject matter jurisdiction as it relates to Plaintiffs' allegations of injury hinges on what the Court is permitted to review at this early stage of litigation. Lockheed generally construes its challenge to standing as "facial," ECF 48, at 12, in which it attacks the legal sufficiency of a plaintiff's jurisdictional allegations. *See Kerns*, 585 F.3d at 192. "In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.* Plaintiffs, on the other hand, appear to ultimately construe the attack as a *factual* one, ECF 35, at 6, wherein a plaintiff "is afforded less procedural protection" because "[a] trial court may go beyond the complaint." *Kerns*, 585 F.3d at 194.[12] "In that situation, the presumption of truthfulness normally accorded a

---

[12] Both sides appear to change course somewhat on whether this is a "facial" or "factual" challenge. Defendant initially deemed their jurisdictional challenge to be a "facial" one, and later argued that reviewing Gober's declaration, which was provided by Plaintiffs in response to the motion to dismiss, would be "inappropriate for this facial standing challenge." ECF 48, at 12. Plaintiffs, though they'd provided Gober's declaration and thus explicitly invited the Court to look beyond the face of the complaint, as, even though the declaration was referenced in the complaint, it was not filed as an attachment to it, later objected to additional documentary evidence provided by Defendant at the explicit request of Judge Messitte. ECF 70, at 1–4. In providing that supplemental authority, Defendants argued that the Court *should* consider documentation that was not referenced in, nor integral to the complaint, most notably copies of "the two Group Annuity Contracts Lockheed Martin entered into with Athene in connection with the first PRT transaction" that show, "among other things, that over $4.83 billion was transferred to Athene to be deposited in a Separate Account for purposes of paying monthly benefits to Plaintiffs and other affected retirees and beneficiaries." *Id.* at 4 ¶ 6 (citing ECF 65-7 and ECF 65-8). Defendant also asks the Court to review "copies of the two Group Annuity Contracts Lockheed Martin entered into with Athene in connection with the second PRT transaction" which also purportedly shows "that over $4.28 billion was transferred to Athene to be deposited in a Separate Account for purposes of paying monthly benefits to affected retirees and beneficiaries." *Id.* at 5 ¶ 7 (citing ECF 65-9 and ECF 65-10).

complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* at 193.

On the one hand, it is hornbook law that, as noted above, the Court "may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning [subject matter] jurisdiction." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (citing 2A James W. Moore, *Moore's Federal Practice* ¶ 12.07, at 12-49–12-50 (2d ed. 1994)). However, it must be repeated that "when jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." *Kerns*, 585 F.3d at 193; *see also JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010) ("When a factual attack on subject matter jurisdiction involves the merits of a dispute," the more appropriate course "is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." (quotation omitted)); *Denny's Inc. v. Cake*, 364 F.3d 521, 525 n.4 (4th Cir. 2004) (applying rule in ERISA context, involving question of personal jurisdiction).

Here, Plaintiffs raise various factual claims in support of the assertion that Athene is at risk of collapse and that Lockheed's transfer of pension responsibilities to Athene was a violation of various fiduciary duties. Lockheed, for its part, counters with a narrative attesting to the solvency, if not vibrancy, of Athene and further attesting to multiple "layers" of protection that would have to fail in order for Plaintiffs to ever suffer a concrete loss. ECF 26-1, at 22. It asks the Court to review and credit documentation attesting to the deposit of billions of dollars solely for the purpose of paying its obligations under the PRTs. *See* ECF 65-7 through ECF 65-10. Plaintiffs provide a

26

declaration of Mr. Gober, whose findings are also referenced in the complaint,[13] to establish the risk associated with a PRT to Athene. *See* ECF 35-3, at 1–19. Further, beyond merely objecting to the Court's consideration of Defendant's additional documents, *see* ECF 70, Plaintiffs have had no meaningful opportunity to evaluate and challenge Lockheed's implied assertion that these "separate accounts" obviate the risk that Athene may fail to pay Plaintiffs what they are owed, *see* ECF 65. As noted above, the Court cannot find that the jurisdictional allegations on the face of the complaint are frivolous. Moreover, the allegations related to the relative financial health of Athene are central to the merits of Plaintiffs' claims, not simply the standing argument. Thus, in the Court's view, it would be imprudent to weigh in on the veracity of those allegations at this early stage of litigation, at least without further discovery, as these claims are "inextricably intertwined with those central to the merits." *Kerns*, 585 F.3d at 193. Suffice to say that, at this early stage, Plaintiffs have sufficiently alleged injury for Article III purposes by alleging a substantially increased risk that the Athene annuity may fail and jeopardize Plaintiffs' future benefits.

The Court also notes that while it is rejecting Defendant's injury-related challenge at this early stage, subject matter jurisdiction may be challenged "at any time." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites*, 456 U.S. 694, 701–02 (1982); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Thus, if further discovery reveals that this case does not present a risk-of-collapse scenario similar to the one left unaddressed in *Thole*, Defendant is free to again raise the issue.

---

[13] As noted above, at the motions hearing, Judge Messitte accurately noted that because portions of the Gober declaration were referenced in the complaint, he would effectively consider it as integral to the complaint. As such, the Court will adhere to that promise here.

2. *Ripeness & Statutory Standing*

Lockheed makes two additional contentions related to standing that the Court will address only briefly as it finds that both lack merit. *First*, Lockheed argues that Plaintiffs' claims are unripe because the claims are contingent on future events, i.e., that "multiple layers of protection fail," before their injury materializes. ECF 26-1, at 22–23. *Second*, since Plaintiffs admit that they "are *former* participants in the [P]lans" Lockheed alleges Plaintiffs lack statutory standing under 29 U.S.C. §§ 1132(a)(2) or (a)(3) since these ERISA provisions require a lawsuit to be raised by a *current* participant or beneficiary. *Id.* at 25 (citing ECF 1, at 5–6 ¶¶ 13–16).

As to the statutory standing argument, it is true that section 1132(a)(2) and (a)(3) authorizes civil actions by "participant[s]," which, at the time the suit was filed, Plaintiffs were not.[14] *See* 29 U.S.C. §§ 1132(a)(2); (a)(3). However, Plaintiffs contend that "participant" status "is properly assessed as of the time of the fiduciary's misconduct, rather than the date of suit." ECF 35, at 25. Since Plaintiffs allege the breach of fiduciary duty occurred in the choosing of Athene while Plaintiffs were still participants in the Plans, "each of the Plaintiffs was certainly a 'participant' to whom Lockheed owed statutory duties of loyalty and prudence" thus greenlighting any viable claims under sections 1132(a)(2) and (a)(3). *Id.*

It appears that the statutory viability of the challenged claims hinge, like constitutional standing, on the *type* of claim Plaintiffs raise. Here, "[t]he key factor supporting plaintiffs' standing to sue . . . relates to the fiduciaries' alleged scheme to profit personally from the breach of the duty of loyalty." *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock,*

---

[14] Under ERISA, "participant" is defined as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

861 F.2d 1406, 1418 (9th Cir. 1988). "It would be ironic if the very act[] of . . . plan termination that allegedly resulted in a fiduciary personally obtaining ill-gotten profits should also serve to deny plan beneficiaries standing to seek a constructive trust on those profits to redress the fiduciaries' alleged breach of the duty of loyalty." *Id.* For this reason, in cases where an ERISA plan has been "sp[u]n off" into a new one and a predecessor plan has been sued for actions related to the former plan, "[t]he practice of the courts has been to disregard the distinction between participation in the predecessor and successor plans for standing purposes." *See Bass v. Ret. Plan of Conoco, Inc.*, 676 F. Supp. 735, 741 (W.D. La. 1988) (collecting cases).

The Court finds guidance in Judge Blake's opinion in *In re Mutual Fund Investment Litigation*, 403 F. Supp. 2d 434 (D. Md. 2005). There, the plaintiffs argued "that the defendants' breaches of fiduciary duty diminished the value of the shares in the mutual fund families in which [the plaintiffs'] retirement [plans] were invested, and thus [plaintiffs' claimed they] received less money than they were entitled to when they left the [retirement p]lans." *Id.* at 441. At the time of the lawsuit, however, the plaintiffs had "accepted a lump-sum pay-out (or rollover) of . . . vested benefits" and thus were no longer technically participants in the plans they were suing. *Id.* at 442. After surveying relevant caselaw, Judge Blake held that "that employees should not forfeit a cause of action under ERISA to recover what is rightfully theirs under their plan by taking a pay-out of what they incorrectly believe is all that is owed to them at the time." *Id.* The same logic would apply here where Plaintiffs cannot be said to forfeit a cause of action addressing their interest in an ERISA plan simply because that plan, apparently without their input or agreement, was transferred and closed and where they are clearly bringing suit to protect their rights in that former plan. Stated differently, "[i]t would substantially undermine the protection ERISA gives to pension fund participants if individuals who are owed benefits stemming from their participation

29

in one plan were foreclosed from challenging actions related to the transfer of those benefits to a new plan." *Waters Corp. v. Millipore Corp.*, 140 F.3d 324, 326 (1st Cir. 1998) (citation omitted); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989) (holding that the term "participant" in ERISA includes "former employees who . . . have 'a colorable claim' to vested benefits").

Nor does Lockheed dispute that Plaintiffs' have statutory standing under 29 U.S.C. § 1132(a)(9). That section provides:

> [I]n the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by the Secretary, *by any individual who was a participant or beneficiary at the time of the alleged violation*, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts[.]

29 U.S.C. § 1132(a)(9) (emphasis added). "[A] violation of Part 4 of this title" includes Plaintiffs' relevant causes of action: 29 U.S.C. § 1104(a)(1)(A)–(B) (Count I), ECF 1, at 27–29, and 29 U.S.C. § 1106 (Count II), *id.* at 29–30. Subsection (a)(9) is broad and allows plaintiffs to seek "appropriate relief . . . to assure receipt . . . of the amounts provided by such insurance contract or annuity . . . ." It is not limited to a specific type of relief, whereas subsection (a)(2) is confined by § 1109 and (a)(3) is limited to "equitable relief." Thus, Plaintiffs have statutory standing for their claims under subsection (a)(9). *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449 (9th Cir. 1995) (holding that plaintiffs, who raised claims under §§ 1104 and 1106 for the PRT to Executive Life, had statutory standing under § 1132(a)(9)); *see also Bussian*, 223 F.3d 286 (deciding suit for breaches of fiduciary duty and loyalty under § 1104 for the PRT to Executive Life)

The Court also agrees that the dispute is ripe for review. When evaluating whether a claim is ripe for review, the Court "balance[s] the fitness of the issues for judicial decision with the

30

hardship to the parties of withholding court consideration." *Miller*, 462 F.3d at 319 (quotation marks and citations omitted). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (citing *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] . . . ." *Id.* (quotation marks and citation omitted) (brackets in original). "When considering hardship, [the court] may consider the cost to the parties of delaying judicial review." *Id.* (citation omitted).

Defendant contends that "Plaintiffs' complaint is a textbook example of claims unfit for present judicial resolution" because Plaintiffs' "theory of injury rests on an attenuated chain of events that has yet to transpire and whose occurrence is far from certain or even imminent." ECF 35, at 24. However, this is argument merely repeats Lockheed's claims regarding the adequacy of Plaintiffs' alleged injuries and ignores factors relevant to whether Plaintiff's allegations are ripe for review. The Court agrees with Plaintiffs that "[b]ecause the transactions [at the heart of the case] already occurred, the evidence needed to adjudicate these claims already exists and does not depend on future events." ECF 35, at 24. Thus, the issue at hand— the propriety of the PRTs— is fit for a judicial decision and "not dependent on future uncertainties." *Miller*, 462 F.3d at 319. Moreover, the Court agrees with Plaintiffs that delaying judicial review may "cause the loss of critical merits evidence regarding the selection of Athene, including correspondence and documents between Lockheed and Athene, as well as the deteriorated memory of decisionmakers." ECF 35, at 24. The matter is ripe for review.

## A. Rule 12(b)(6): Breach of Fiduciary Duty, Failure to Monitor, & Prohibited Transactions

Finally, the Court will briefly address Lockheed's arguments that Plaintiffs fail to state a claim. To recap, Plaintiffs allege three Counts: Count I for Breach of Fiduciary Duties (29 U.S.C. § 1104(a)(1)(A)–(B)), Count II for Prohibited Transactions (29 U.S.C. § 1106), and Count III for Failure to Monitor Fiduciaries.

### 1.  Counts I & III

Lockheed attacks the complaint claiming that: (1) the complaint lacks the required specific allegations that Lockheed served as a fiduciary when it selected Athene, ECF 26-1, at 27– 29; (2) Plaintiffs fail to make a sufficient showing of harm, including by failing to allege that a prudent fiduciary would not have engaged in the PRT transactions, *id.* at 29– 32; and (3) Plaintiffs fail to allege that Lockheed caused them any harm, *id.* at 24–25. Defendant also argues that the failure to monitor claim, Count III is "downstream" and derivative of a claim for breach of fiduciary duties, thus Lockheed claims it fails for the same reasons. *Id.* at 37.

As to the second and third claims, to state a claim for breach of fiduciary duty, a plaintiff need only plausibly allege that a fiduciary breached a duty. Harm, in the form of financial injury, need not be alleged. *See Peters*, 2 F.4th 218–19 (holding that ERISA plaintiffs do not have to "demonstrate a financial injury" separate from the underlying breach of fiduciary duty for equitable relief). Nevertheless, it is sufficient that Plaintiffs asserted that the harm they suffered includes "an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk." ECF 1, at 28 ¶ 73. This harm is alleged to have been caused by Lockheed when it chose an annuity provider that exposed Plaintiffs to a substantial risk that their future pension benefits would be lost. *Id.* at 4 ¶ 7, at 20 ¶ 55. The Court will not repeat its Article III standing analysis but

32

incorporates it here. At this stage of the case, taking the allegations in the complaint as true and making all reasonable inferences in a light most favorable to Plaintiffs, the complaint adequately alleges Plaintiffs were harmed by the PRT transfer.

The Court also rejects Lockheed's contention that it did not serve as a fiduciary when it selected Athene. ERISA imposes fiduciary duties on "persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Savs. Bank*, 510 U.S. 86, 96 (1993); 29 U.S.C. § 1104(a). Lockheed claims that a plan sponsor does not become a fiduciary when it performs "settlor" functions, which it alleges includes the subject PRT transactions. ECF 26-1, at 12 (citation omitted). Plaintiffs counter that "[s]electing an annuity provider is a fiduciary act, because it involves plan management, administration, and the disposition of plan assets." ECF 35, at 26–27.

Both parties cite *Beck*, 551 U.S. at 101–02, for their respective positions. ECF 26-1, at 29 (Defendant); ECF 35, at 27 (Plaintiffs). *Beck* did acknowledge that "an employer's decision whether to *terminate* an ERISA plan is a settlor function immune from ERISA's fiduciary obligations." 551 U.S. at 102 (emphasis added). However, *Beck* further acknowledged that ERISA imposes "a fiduciary obligation" on those who select "an appropriate annuity provider when terminating through annuities[.]" *Id.* (citing 29 CFR §§ 2509.95–1, 4041.28(c)(3)).[15] Lockheed also cites to *Lee*, 837 F.3d at 538, to support its claim that annuity transactions "are not subject to fiduciary duty requirements." *See* ECF 26-1, at 12 (quoting *Lee*, 837 F.3d at 538). The claim raised in *Lee*, however, was that the relevant defendant (Verizon), acting solely as a plan

---

[15] This section provides that "[i]n the case of plan benefits that will be provided by purchase of an irrevocable commitment from an insurer, the plan administrator *must select the insurer in accordance with the fiduciary standards of Title I of ERISA.*" 29 CFR § 4041.28(c)(3) (emphasis added).

sponsor, "breached its fiduciary duty by entering into the annuity transaction." 837 F.3d at 537.

Thus, the act that the Fifth Circuit found did not trigger a fiduciary duty centered on "the *decision*

to transfer pension assets outside ERISA coverage," *id.* (emphasis added), not on the *process* of

selecting the annuity provider to whom the assets would be transferred. Indeed, the *Lee* Court

went on to dissect whether those defendants responsible for the *selection* of a particular annuity

provider violated a breach of fiduciary duty, which is the precise claim Plaintiffs raise here. *Id.* at

539. *Lee* thus provides no basis to conclude that selection of an annuity provider falls outside of

the standard set forth in 29 U.S.C. § 1104(a). *See* 29 U.S.C. § 1132(a)(9) (providing private right

of action for breach of fiduciary duty "in the event that the purchase of an . . . insurance annuity in

connection with the termination of an individual's status as a participant covered under a pension

plan"); 29 CFR § 2509.95-1 (providing that "[t]he selection of an annuity provider for purposes of

a pension benefit distribution, whether upon separation or retirement of a participant or upon the

termination of a plan, is a fiduciary decision governed by the provisions of part 4 of title I of

ERISA"); *Kayes*, 51 F.3d at 1455 (stating that 29 U.S.C. § 1132(a)(9) was passed by Congress

because "courts have wrongly held that annuitants . . . lack standing under ERISA *to challenge the*

*decision of the plan fiduciary to dispose of plan assets by purchasing annuities*" (quoting 130

Cong. Rec. H. 10621 (Oct. 3, 1994))); *Bussian*, 223 F.3d at 293 n.8 ("We find ERISA's failure to

exempt purchasing annuities from § [1104]'s fiduciary obligations to be a powerful indicator of

Congress' intent *not* to exempt the process for choosing annuity providers—possibly the most

important decision in the life of the plan—from fiduciary scrutiny." (quoting *Waller v. Blue Cross*

*of Cal.*, 32 F.3d 1337, 1343–44 (9th Cir. 1994))).

　　　　Lockheed also admits that "plan fiduciaries must engage in a prudent *process* when making

decisions affecting the plan," but argues that the complaint fails to allege any facts establishing a

deficient process. ECF 26-1, at 28 (emphasis in original). The Court, however, agrees with Plaintiffs that Lockheed's alleged breach of the duty of loyalty "by favoring its own corporate interests over the participants' interests in a secure retirement," ECF 1, at 28 ¶ 72, *implies* an inherently flawed process. Taking the facts in the complaint as true, the Court infers that Lockheed was either acting in its own self-interest *or* failed to make a reasonable investigation into Athene's risk of default by selecting a cheaper, higher-risk annuity provider. This is sufficient at the pleading stage.

The Court finds that Plaintiffs have plausibly alleged that Lockheed was acting as a fiduciary and that it breached its fiduciary duty when it transacted with Athene to increase its own profits. Furthermore, as Lockheed concedes, Count III, the failure to monitor claim, is derivative of Count I the Court denies Lockheed's motion to dismiss these counts.

2. *Count II*

Under ERISA, transactions between a plan and a "party in interest" involving the "sale or exchange, or leasing, of any property"; the "furnishing of goods, services, or facilities"; and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" are prohibited. 29 U.S.C. § 1106(a). Lockheed argues that Plaintiffs failed to plead specific facts that show Athene was a "party-in-interest" and that the transactions were intended to benefit Athene. ECF 26-1, at 33–34. Lockheed says Plaintiffs must plead that "Athene was providing services to the plan at the time of the alleged prohibited transaction." *Id.* at 34. Further, Plaintiffs "must allege that a fiduciary intended to benefit the party in interest (here, Athene) at participants' expense." *Id.* at 35 (citing *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019)). Otherwise, Lockheed says, the transactions fall under two statutory exemptions to § 1106(a): (1) transactions where the plan pays no more than adequate consideration and (2) purchases of insurance or annuity

35

contracts from an insurance company. *Id.* at 36. Plaintiffs respond by arguing that they have

alleged two types of prohibited transactions: (1) party-in-interest (29 U.S.C. § 1106(a)), and (2)

self-dealing (29 U.S.C § 1106(b)). The Court considers each in turn.

*First*, a "party in interest" is "a person providing services to [an employee benefit] plan."

29 U.S.C. § 1002(14)(b). Athene, they say, is a company that "facilitated partially terminating the

Plans" instead of a replacement to the plans. ECF 35, at 34. But Plaintiffs also point to DOL

documents they say exhibits a "preexisting relationship" with the Plans "as an insurance and

investment provider." *Id.* at 35; ECF 35-2, at 2 (Form 5500 showing Athene as insurer). To the

extent the Court can even consider additional documents in considering this portion of the motion

to dismiss,[16] that document, entitled Lockheed's "Master Retirement Trust," lists Athene as an

"insurance carrier"[17] and under a section noted "[i]nformation on *interests* in MTIAs, CCTs, PSAs,

and 103-1 IEs."[18]   *Id.* at 6–7 (emphasis added). It is not clear at all that Athene "provid[ed]

services" to the Plans from the documents, much more the face of the complaint, thus the Court

---

[16] It likely it cannot as this is a motion to dismiss raised under Rule 12 (b)(6) and the documents at issue, though "authentic," are not "integral" to the complaint. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

[17] The DOL has opined that insurance carriage alone does not cause the insurance company to become a party-in-interest. U.S. Dep't of Labor, ERISA Opinion Letter No. 76-36. The Opinion Letter states that "the sale by an insurance company of a group insurance policy to an employer to fund an employee benefit plan would not alone cause the insurance company to become a party in interest to the plan." *Id.* The Department explained that party-in-interest status would attach, for example, when there is "indication . . . for example, that the insurance company provides *services* to the plan in addition to the sale of the insurance policy . . . ." *Id.*

[18] These terms stand for master trust investment accounts (MTIAs), common/collective trusts (CCTs), insurance company pooled separate accounts (PSAs), and 103-12 investment entities (103-12 IEs). According to the Department's Annual Report, the Plans use Form 5500 to "report assets by indicating holdings in [these] various pooled investment vehicles." U.S. Dep't of Labor, Empl. Benefits Sec. Admin, Oct. 2022 Form 5500 Direct Filing Entity Bulletin, https://www.dol.gov/sites/dolgov/files/ebsa/researchers/statistics/retirement-bulletins/form-5500-direct-filing-entity-user-guide.pdf. Such investments do not raise any service-providing red flags.

agrees with Lockheed that there are no facts to plausibly support Plaintiffs' allegation that Athene is a party-in-interest to the Plans.

*Second*, the complaint alleges a § 1106(b) violation of purported "self-dealing." ECF 1, at 29 ¶ 78. Under subsection (b), a fiduciary is not permitted to "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § § 1106 (b)(1). Plaintiffs allege that "[b]y using pension trust assets to purchase Athene annuities instead of the safest available annuity," Lockheed "dealt with the assets of the Plans in [Lockheed's] own interest or for their own account . . . and adverse to the interests of the Plans' participants and their beneficiaries." ECF 1, at 30 ¶ 81 (citing 29 U.S.C. §§ 1106(b)(l)–(2). Lockheed seeks dismissal of this claim because Plaintiffs cannot show self-dealing because the assets saved in the partial PRT transaction remained in the plans and thus, logic goes, could not have been self-dealing. ECF 48, at 21. Lockheed further states that "[f]uture events, including the performance of the plans' portfolio, will determine if additional contributions may be needed, something neither Lockheed Martin nor Plaintiffs can predict." *Id.* However, as noted above, employers are "on the hook" for shortfalls. *Thole*, 590 U.S. at 543. Regardless, it is plausible enough that Lockheed acted for its own benefit in selecting Athene if, in fact, it proves true that the decision to choose Athene placed Lockheed's interests, even if only in the short run, over those of participants in the Plans. Because Plaintiffs plausibly allege a that Lockheed committed a prohibited transaction under 29 U.S.C. § 1106(b), the Court denies Lockheed's motion to dismiss Count II.

37

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Lockheed Martin's motion to dismiss for lack of subject matter jurisdiction is denied.

A separate implementing Order will issue.

Dated: <u>March 28, 2025</u>

/s/
Brendan A. Hurson
United States District Judge

38